**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile:  (914) 206-3656
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Max S. Roberts (State Bar No. 363482)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-mail: mroberts@bursor.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STACY PENNING, individually and on behalf of all others similarly situated, | Case No. 3:25-cv-03531-WHO |
| Plaintiff, | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| INSURANCE ZEBRA, INC., d/b/a THE ZEBRA | **JURY TRIAL DEMANDED** |
| Defendant. | |

# TABLE OF CONTENTS

**PAGE**

NATURE OF THE ACTION ........................................................................................................1

THE PARTIES ...........................................................................................................................1

JURISDICTION AND VENUE ..................................................................................................2

FACTUAL ALLEGATIONS ......................................................................................................2

I.    CALIFORNIA AND FEDERAL LAW PROTECT USERS' PRIVACY IN THEIR
      INSURANCE-RELATED AND FINANCIAL COMMUNICATIONS .............................2

      A.    The California Invasion Of Privacy Act ................................................................2

      B.    The California Insurance Information And Privacy Protection Act..........................4

      C.    The Gramm-Leach-Bliley Act And The California Financial
            Information Privacy Act .........................................................................................5

II.   DEFENDANT ENABLES META AND GOOGLE TO COLLECT USERS' NON-
      ANONYMOUS FINANCIAL AND INSURANCE-RELATED INFORMATION .............8

      A.    The Third Parties—As Enabled By Defendant—Read, Learn, And
            Intercept Plaintiff's And Class Members' Substantive, Insurance-
            Related Communications......................................................................................10

            1.    Meta Intercepts And Reads The Contents Of Users' Insurance-
                  Related Communications...........................................................................10

            2.    Google Intercepts And Reads The Contents Of Users'
                  Insurance-Related Communications...........................................................11

      B.    The Third Parties—As Enabled By Defendant—Record And Decode
            Addressing Information Identifying Plaintiff And Class Members That
            Are Associated With The Insurance-Related Communications..............................13

            1.    Meta Records And Decodes Addressing Information
                  Associated With Users' Communications...................................................13

            2.    Google Records And Decodes Addressing Information
                  Associated With Users' Communications...................................................14

III.  DEFENDANT USES AND EMPLOYS THE THIRD PARTIES' PIXELS TO
      IDENTIFY USERS TO FACILITATE MARKETING AND ADVERTISING .................17

      A.    Defendant Uses Meta's Pixel To Identify Users And Drive Revenue
            Through Marketing And Advertising.....................................................................17

      B.    Defendant Uses Google's Pixel To Identify Users And Drive Revenue
            Through Marketing And Advertising.....................................................................23

IV.   EXPERIENCE OF PLAINTIFF PENNING.................................................................25

CLASS ALLEGATIONS ...................................................................................................................27

CAUSES OF ACTION ......................................................................................................................29

    COUNT I .......................................................................................................................................29

    COUNT II ......................................................................................................................................31

    COUNT III ....................................................................................................................................33

    COUNT IV ....................................................................................................................................35

PRAYER FOR RELIEF ....................................................................................................................37

JURY TRIAL DEMANDED .............................................................................................................38

Plaintiff Stacy Penning ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Insurance Zebra, Inc., d/b/a The Zebra ("Defendant" or "The Zebra"). Plaintiff brings this action based upon personal knowledge of the facts specifically pertaining to himself, and on information and belief as to all other matters, by and through the investigation of the undersigned counsel.

## NATURE OF THE ACTION

1.      This class action lawsuit is brought on behalf of all persons who accessed and used Defendant's web-based insurance comparison service, thezebra.com (the "Website"), to search for, obtain, or compare different insurance quotes (the use of the Website known as "The Zebra Service").

2.      Defendant aids, agrees with, employs, or procures third parties Meta Platforms, Inc., formerly known as Facebook, Inc. ("Meta") and Google LLC ("Google" and together with Meta, the "Third Parties") to intercept the contents of communications sent and received by Plaintiff and Class Members, including communications related to insurance.  By failing to procure consent before enabling Meta and Google's interception of these communications, and by disclosing such information to Facebook and Google, Defendant violated the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.* ("ECPA") and Sections 631 and 632 of the California Invasion of Privacy Act ("CIPA").

3.      Moreover, Meta and Google's pixels recorded the "routing, addressing, or signaling" information associated with the aforementioned communications, including but not limited to Plaintiff's and Class Members' Facebook IDs, hashed e-mail addresses, device information, and Google UIDs.  Meta and Google's pixels thus constitute "pen registers" under CIPA § 638.50(b). Moreover, this information was used by Defendant and the Third Parties to de-anonymize and identify the users behind the insurance-related communications to facilitate marketing and targeted advertising.  Because Defendant installed and used these "pen registers" without Plaintiff's and Class Members' consent or a court order, Defendant also violated CIPA § 638.51(a).

## THE PARTIES

4.      Plaintiff Stacy Penning is a citizen of the State of California over the age of 18, and lives in El Cerrito, California with an intent to remain there.  Plaintiff Penning is therefore a resident

of California.

5.     Defendant Insurance Zebra, Inc., d/b/a The Zebra is a corporation incorporated under the laws of Delaware with its principal place of business in Austin, Texas.  Defendant owns and operates the insurance comparison website nationwide and found at thezebra.com.  Defendant chose to embed the tracking technology provided by Facebook and Google onto its Website, as described more thoroughly below.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511).  This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

7.     Further, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from the defendant.

8.     This Court has personal jurisdiction over Defendant because Defendant purposefully availed itself of this forum by conducting substantial business within California such that Defendant has significant, continuous, and pervasive contacts with the State of California.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District and a substantial part of the events giving rise to Plaintiff's claim took place within this District.

## FACTUAL ALLEGATIONS

I.     **CALIFORNIA AND FEDERAL LAW PROTECT USERS' PRIVACY IN THEIR INSURANCE-RELATED AND FINANCIAL COMMUNICATIONS**

A.     **The California Invasion Of Privacy Act**

10.     The California Legislature enacted CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has

created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

11. The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

12. Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—*the right to control the nature and extent of the firsthand dissemination of his statements.*

*Ribas*, 38 Cal. 3d at 360-61 (emphasis added; internal citations omitted); *see also Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 200 (2021) (reaffirming *Ribas*). This is a historically recognized privacy right. *See, e.g., Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.")

13. While Plaintiff alleges claims under multiple provisions of the CIPA, the privacy implications are the same for each section, whether those claims involve insurance-related communications or identifiers used to de-anonymize users for advertising purposes. *See LoanMe*, 11 Cal. 5th at 199 ("This philosophy appears to lie at the heart of virtually all the decisions construing the Invasion of Privacy Act.") (cleaned up).

14. "In light of this intent, the California Supreme Court has instructed courts to interpret CIPA in the manner that 'fulfills the legislative purpose of CIPA by giving greater protection to privacy interests.'" *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016) (Koh, J.) (quoting *Flanagan v. Flanagan*, 27 Cal. 4th 766, 775 (2002)). This directive applies "when

faced with two possible interpretations of CIPA." *Matera*, 2016 WL 8200619, at \*19; *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at \*2 (9th Cir. May 31, 2022) (noting "the California Supreme Court has [] emphasized that all CIPA provisions are to be interpreted in light of the broad privacy-protecting statutory purposes of CIPA").

15. Individuals may bring an action against the violator of any provision of the CIPA for treble actual damages or statutory damages of $5,000 per violation. Cal. Pen. Code § 637.2(a).

**B.    The California Insurance Information And Privacy Protection Act**

16. The California Legislature enacted the Insurance Information and Privacy Protection Act ("IIPPA"), Cal. Ins. Code §§ 791, *et seq.*, to "establish standards for the collection, use and disclosure of information gathered in connection with insurance transactions by insurance institution, … to maintain a balance between the need for information by those conducting the business of insurance and the public's need for fairness in insurance information practices, including the need to minimize intrusiveness [and] to limit the disclosure of information collected in connection with insurance transactions." Cal. Ins. Code § 791.

17. Importantly, the Act creates privacy protections for individuals in insurance transactions by regulating how the insurance industry collects, uses, and discloses personal information.

18. The IIPPA prohibits the unauthorized disclosure of "any personal or privileged information about an individual collected or received in connection with an insurance transaction." Cal. Ins. Code § 791.13.

19. "Personal information" is defined as "any individually identifiable information gathered in connection with an insurance transaction from which judgments can be made about an individual's character, habits, avocations, finances, occupation, general reputation, credit, health, or any other personal characteristics," including "an individual's name and address and 'medical record information.'" Cal. Ins. Code § 791.02(s).

20. As relevant here, California has a strong and explicit legislative intent to protect Californians from the disclosure of personal information that is shared through insurance transactions.

**C.    The Gramm-Leach-Bliley Act And The California Financial Information Privacy Act**

21.    As Congress has recognized, "nonpublic personal information" is entitled to "security and confidentiality."  15 U.S.C. § 6801(a).  Thus, Congress enacted the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801, *et seq.* (the "GLBA").

22.    Under the GLBA, pursuant to 16 C.F.R. § 313.3(n):

(1)    Nonpublic personal information means:

    (i)    Personally identifiable financial information; and

    (ii)    Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available.

23.    Under the GLBA, pursuant to 16 C.F.R. § 313.3(o):

(1)    Personally identifiable financial information means any information:

    (i)    A consumer provides to [a financial institution] to obtain a financial product or service from [a financial institution];

    (ii)    About a consumer resulting from any transaction involving a financial product or service between [a financial institution] and a consumer; or

    (iii)    [A financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer.

(2)    Examples—(i) Information included. Personally identifiable financial information includes:

    (A)    Information a consumer provides to [a financial institution] on an application to obtain a loan, credit card, or other financial product or service;

    (B)    Account balance information, payment history, overdraft history, and credit or debit card purchase information;

    (C)    The fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution];

    (D)    Any information about [a financial institution's] consumer if it is disclosed in a manner that indicates that the individual is or has been [a financial institution's] consumer;

(E)    Any information that a consumer provides to [a financial institution] or that [a financial institution]or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account; and

(F)    Any information [a financial institution] collect[s] through an Internet "cookie" (an information collecting device from a web server).

24.    Pursuant to 16 C.F.R. § 313.3(k)(1):

a financial institution means any institution the business of which is engaging in an activity that is financial in nature or incidental to such financial activities as described in section 4(k) of the Bank Holding Company Act of 1956, 12 U.S.C. 1843(k). An institution that is significantly engaged in financial activities, or significantly engaged in activities incidental to such financial activities, is a financial institution.

25.    The California Legislature passed a similar statute to the GBLA: California Financial Information Privacy Act, Cal. Fin. Code §§ 4501, *et seq.* ("CalFIPA").  However, it was "thee intent of the Legislature in enacting the California Financial Information Privacy Act to afford persons greater privacy protections than those provided in … the federal Gramm-Leach-Bliley Act, and that this division be interpreted to be consistent with that purpose."  Cal. Fin. Code § 4051(b).  The policy underlying CalFIPA is "to provide their consumers notice and meaningful choice about how consumers' nonpublic personal information is shared or sold by their financial institutions."  Cal. Fin. Code § 4051(a).

26.    Cal. Fin. Code § 4052(a) provides that:

"Nonpublic personal information" means personally identifiable financial information (1) provided by a consumer to a financial institution, (2) resulting from any transaction with the consumer or any service performed for the consumer, or (3) otherwise obtained by the financial institution.

…

Nonpublic personal information shall include any list, description, or other grouping of consumers, and publicly available information pertaining to them, that is derived using any nonpublic personal information other than publicly available information, but shall not include any list, description, or other grouping of consumers, and publicly available information pertaining to them, that is derived without using any nonpublic personal information.

27.    According to Cal. Fin. Code § 4052(b):

"Personally identifiable financial information" means information (1) that a consumer provides to a financial institution to obtain a product or service from the financial institution, (2) about a consumer resulting from any transaction involving a product or service between the financial institution and a consumer, or (3) that the financial institution otherwise obtains about a consumer in connection with providing a product or service to that consumer. Any personally identifiable information is financial if it was obtained by a financial institution in connection with providing a financial product or service to a consumer.

Personally identifiable financial information includes all of the following:

(1)    Account balance information, payment history, overdraft history, and credit or debit card purchase information.

(2)    The fact that an individual is or has been a consumer of a financial institution or has obtained a financial product or service from a financial institution.

(3)    Any information about a financial institution's consumer if it is disclosed in a manner that indicates that the individual is or has been the financial institution's consumer.

(4)    Any information that a consumer provides to a financial institution or that a financial institution or its agent otherwise obtains in connection with collecting on a loan or servicing a loan.

(5)    Any personally identifiable financial information collected through an Internet cookie or an information collecting device from a Web server.

28.    "Except as provided in Sections 4053, 4054.6, and 4056, a financial institution shall not sell, share, transfer, or otherwise disclose nonpublic personal information to or with any nonaffiliated third parties without the explicit prior consent of the consumer to whom the nonpublic personal information relates."  Cal. Fin. Code § 4052.5.

29.    Thus, Plaintiff's and Class Members' "nonpublic personal information" is confidential financial information under both federal and California law.

## II.    DEFENDANT ENABLES META AND GOOGLE TO COLLECT USERS' NON-ANONYMOUS FINANCIAL AND INSURANCE-RELATED INFORMATION

30.    Defendant owns and operates the Website, which sells insurance policies to consumers across the United States.  Defendant provides its users with the ability to compare insurance rates and "streamline[s] [users'] research process by delivering personalized insurance quotes from top companies."[1]  Defendant works with over a hundred insurance companies to offer insurance policies to users, and Defendant has a team of over a hundred licensed agents to help users select a policy.

31.    To use Defendant's Website, a user must first share what type of insurance they are looking for (e.g., home, car, or pet insurance) then share any additional relevant information (e.g., zip code, the car's make and model, or pet breed).  After sharing their personal information, the user "sit[s] back while [Defendant's] algorithm gets to work finding [the user] the best policy."[2]  Last, Defendant provides quotes for different insurance policies and the user can choose and purchase whichever policy best fits their needs.

32.    According to Defendant, it monetizes its Website in one of two ways.  *First*, if a user purchases a policy through one of its licensed insurance agents, Defendant makes a commission.[3] *Second*, if a user purchases a policy from one of the quotes Defendant provided, then Defendant makes a commission from the insurance company that provided the policy.[4]

33.    Defendant states that it "doesn't earn money by selling [users'] data to a bunch of insurance companies" and is adamant that it "never sell[s] [user'] information.  We mean it."[5]



---

[1]  Kristine Lee, *How to Get a Car Insurance Quote*, THEZEBRA (April 10, 2025), https://www.thezebra.com/car-insurance-quotes/.

[2] *How Does The Zebra Work?*, THEZEBRA, https://www.thezebra.com/about/how-the-zebra-works/.

[3] *Id.*

[4] *Id.*

[5] *Id.*

34.    This is highly misleading.  As described below, Defendant enables Meta and Google to collect its users' personally identifiable insurance-related and financial communications to (i) enable users to be matched up to profiles held by both of those entities, and (ii) enable those profiles to be built upon with insurance and financial-related information.  This facilitates targeted advertising by Defendant and similar companies on Meta's website or on other websites that make use of Google's advertising platform.  Such conduct drives revenue for Defendant.

35.    Defendant does this by installing and using Meta's and Google's pixels on Defendant's users browsers, or otherwise aiding, agreeing with, employing, or enabling Meta and Google to collecting the aforementioned information.

36.    A research paper presented at the Association for Computing Machinery Web Conference in 2023 states that "[a tracking pixel] is a piece of JavaScript code added to a website as a graphic element[, ] 1 × 1 pixel [in size,] that is loaded when a user lands on the website hosting it."[6]  "When a user visits a [tracking pixel]-enabled website, an instance of the [tracking] pixel loads in the HTML code of the page on the browser."[7]

37.    "[I]f a corresponding … cookie does not exist on the browser, one is created and a unique ID is saved."[8]  Then, the tracking pixel's "embedded [] URL point[s] to [a third party's (*e.g.*, Meta or Google)] servers[] … [and] report[s] to [the third party (*i.e.*, Facebook)] the user['s] activity for the duration of the visit[,]" along "with [the] specific ID reflecting the specific [website user. This] can be used [] to track [] audiences for brand ads."[9]

38.    When a user accesses a website hosting the either Meta or Google's pixel, the Third Parties' software script surreptitiously directs the user's browser to contemporaneously send a separate message to the Third Parties' servers.  This second, secret transmission contains the original GET request sent to the host website, along with additional data that the Third Parties' pixels are configured to collect.  This transmission is initiated by the Third Parties' code concurrently with the

[6] Paschalis Bekos et al., *The Hitchhiker's Guide To Facebook Web Tracking With Invisible Pixels And Click Ids*, at 2, (2023) ARXIV, https://arxiv.org/pdf/2208.00710.

[7] *Id.*

[8] *Id.*

[9] *Id.*

communications with the host website.  Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code, and the Third Parties' embedded code.

39.     At no point prior to enabling the Third Parties' pixels, nor installing and using on users' browsers, did Defendant receive Plaintiff's or Class Members' consent.

**A.     The Third Parties—As Enabled By Defendant—Read, Learn, And Intercept Plaintiff's And Class Members' Substantive, Insurance-Related Communications**

40.     When a user visits the Website, they have the option to receive quotes for several types of insurance, such as car insurance (like Plaintiff) or home insurance.  Users will then be presented with a form for them to affirmatively fill out or select options that supply the information used to find a quote.  Unbeknownst to Plaintiff and Class Members, however, Meta and Google—as enabled by Defendant—simultaneously receive users' insurance-related communications.

*1.     Meta Intercepts And Reads The Contents Of Users' Insurance-Related Communications*

41.     For example, the following screenshot of the network traffic shows Meta reading or learning the following information of a user searching for home insurance as the user is conducting the search.  In the Universal Resource Locator ("URL") of the request, red squares highlight that the individual users: (i) viewed a page on www.thezebra.com (denoted by the "ev=PageView") and (ii) applied for home insurance—as an owner—to compare quotes:

42. By way of a second example, the following screenshot of the network traffic shows Meta reading or learning the following information of a user (like Plaintiff) searching for car insurance as the user is conducting the search. In the URL of the request, red squares highlight that the individual user: (i) viewed a page on www.thezebra.com (denoted by the "ev=PageView") (ii) to compare care insurance quotes:

2. *Google Intercepts And Reads The Contents Of Users' Insurance-Related Communications*

43. The same is true of Google. For example, the following screenshot of the network traffic shows Google reading and learning the following information of a user searching for home insurance as the user is conducting the search. In the URL of the request, red squares highlight that the individual users: (i) viewed a page on www.thezebra.com and (ii) searched for home insurance—as an owner—to compare quotes:

44.    By way of a second example, the following screenshot of the network traffic shows Google the following information of a user searching for car insurance as the user is conducting the search.  In the URL of the request, red squares highlight that the individual user: (i) viewed a page on www.thezebra.com (ii) to compare care insurance quotes:



45.    Google also learns and learns other nonpublic information from a consumers' application, including whether they are currently insured and information related to their residence (*e.g.*, the type of home a person has):



**B.     The Third Parties—As Enabled By Defendant—Record And Decode Addressing Information Identifying Plaintiff And Class Members That Are Associated With The Insurance-Related Communications**

46.     Not only do Meta and Google intercept the substance of users' communications with the Website, their pixels—as installed and used by Defendant—also record and decode "routing, addressing, or signaling information" (unique user identifiers) associated with those communications. Those identifiers are used by Defendant and the Third Parties to de-anonymize and identify the users behind these communications by matching users to profiles held by the Third Parties, which are used for advertising purposes.

   *1.     Meta Records And Decodes Addressing Information Associated With Users' Communications*

47.     For example, as to Meta, the Meta pixel on the Website receives the user's "c_user cookie," a unique identifier associated with a single Facebook user's Facebook profile ("Facebook ID" or "FID"). The "c_user cookie" is associated with each of the aforementioned communications read by Meta (*i.e.*, it is the addressing information associated with those communications in the same way a telephone number would be associated with a telephone call). The cookie is a string of numbers that is unique to every Facebook account—distinguishing each FID from its peers.

```
Cookie:                    datr=9N4NZmTw46H6NwvRsSi0Yhg8; ps_n=1; sb=n5EaZ6b3XMUjYKs2riOQ7rAA;
                           c_user=61553316465049; ar_debug=1;
                           fr=1R6eUUYQJzPnOXCVI.AWf2AsAjvAfyQIVw42vXj9Tk7DPeHZgU0HiUfozB3AZoJz
                           Tzdfg.BoAZBe..AAA.0.0.BoAZBe.AWfbtON40uQCFdA0U0GeW2InTls;
                           xs=8%3AhnzOm1hg8evZhA%3A2%3A1744908752%3A-1%3A-
                           1%3A%3AAcXUADAIraN_LgVuA1pu3K2NrYgI9IDP-hD_BQ6LqA
```

48.     Any person, even those without in-depth technical expertise, can utilize the FID to identify owners of the FID via their Facebook profile by simply appending the Facebook FID to www.facebook.com (www.facebook.com/[FID]). That step, readily available through any internet browser, will direct the browser to the individual FID's profile page, including all the information contained in or associated with the profile page, for the user associated with the particular FID.

49.     As another example, Meta also records the "_fbp cookie" associated with users' insurance-related communications, which Defendant and Meta uses to identify a browser and a

user.[10]  The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[11]  If that happens, the time resets, and another 90 days begins to accrue.

50.     Defendant and Meta, at a minimum, use the _fbp and c_user cookies associated with users' communications to link Plaintiff and Class Members to Facebook IDs and corresponding Facebook profiles, thus de-anonymizing and identifying users.

### 2.     Google Records And Decodes Addressing Information Associated With Users' Communications

51.     As to Google-related examples, Google's pixel on the Website records and decodes at least the following identifiers associated with a user's communication to the Website:

| Name | Value |
|---|---|
| gtm | 45be5ca1p3v889951502z871394146za20gzb71394146zd71394146xea |
| gcd | 13l3l3l3l1l1 |
| dma | 0 |
| tag_exp | 103116026~103200004~104527907~104528500~104684208~104684211~105391252~115583767~115616985~115938466~115938468~116184927~116184929~116251938~116... |
| ga_uid | G-2LLVMVSVKS.551d57b2-9ded-4880-b19f-e6aa06d2aec4 |
| npa | 0 |
| frm | 0 |
| pscdl | noapi |
| auid | 2132950108.1766155298 |
| uaa | x86 |
| uab | 64 |
| uafvl | Chromium%3B142.0.7444.177%7CGoogle%2520Chrome%3B142.0.7444.177%7CNot_A%2520Brand%3B99.0.0.0 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| ec_mode | a |
| ecsid | 948124475.1766155495 |
| em | tv.1~em.GzCyh9SOxf0NP8bcfsV_BXmsY2Kohi8Zi-tTfxTFH3U |

52.     The "ga_uid" parameter "lets [website operators like Defendant] associate your own identifiers with individual users so you can connect their behavior across different sessions and on various devices and platforms.  Analytics interprets each user ID as a separate user, which provides you with more accurate user counts and a more holistic story about a user's relationship with your business."[12]

53.     The "em" parameter is the user's hashed e-mail.  Although many ad-tech providers claim that hashing is "anonymous," the FTC has long warned that "hashing is vastly overrated as an

---

[10] *Id.*

[11] *See Cookies Policy*, META, https://www.facebook.com/policy/cookies/ (last accessed Feb. 4, 2025).

[12] MEASURE ACTIVITY ACROSS PLATFORMS WITH USER-ID, support.google.com/analytics/answer/9213390?hl=en.

'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data *is risky at best, and usually wrong.*"[13]  Indeed, as recently as July of 2024, the FTC stated again that "hashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized."[14]

54.    Even an amateur web developer, let alone a sophisticated technology company like Google, can write a script to discover the hashed value of a user's e-mail.  For instance, for the purposes of this hypothesis, Plaintiff's counsel used the e-mail "nikefan628@gmail.com" for testing. Because this is a G-Mail, Google would have access to this e-mail address.

55.    To run the script, a developer need only use Windows PowerShell, which comes standard on Windows computers and is a way to access command-line tools in Microsoft Windows and come pre-packaged with Microsoft Windows computers.[15]  Other operating systems (*i.e.*, Mac computers) have analogous software that is pre-packaged with the computer.  The script on PowerShell would appear as follows:

```
Windows PowerShell
Copyright (C) Microsoft Corporation. All rights reserved.

Install the latest PowerShell for new features and improvements! https://aka.ms/PSWindows

PS C:\Users\MaxRoberts> $email = "ENTER_EMAIL_HERE"
PS C:\Users\MaxRoberts> $bytes = [System.Text.Encoding]::UTF8.GetBytes($email)
PS C:\Users\MaxRoberts> $hash = [System.Security.Cryptography.SHA256]::Create().ComputeHash($bytes)
PS C:\Users\MaxRoberts> [Convert]::ToBase64String($hash).Replace("+","-").Replace("/","_").TrimEnd("=")
```

56.    Entering the aforementioned e-mail into the script (again, "nikefan628@gmail.com") generates the same hashed value as was disclosed to Google on the Website in Plaintiff's counsel's testing (pictured above, but also reproduced below for convenience):

//

//

//

[13] Ed Felten, *Does Hashing Make Data "Anonymous"?*, Federal Trade Commission (Apr. 22, 2012), https://tinyurl.com/ykttwvjn (emphasis added).

[14] *No, Hashing Still Doesn't Making Your Data Anonymous*, Federal Trade Commission (July 24, 2024), https://tinyurl.com/y5b7nayk.

[15] WHAT IS WINDOWS POWERSHELL?, https://learn.microsoft.com/en-us/powershell/scripting/what-is-windows-powershell?view=powershell-7.5

```
em          tv.1~em.GzCyh9SOxf0NP8bcfsV_BXmsY2Kohi8Zi-tTfxTFH3U

PS C:\Users\MaxRoberts> $email = "nikefan628@gmail.com"
PS C:\Users\MaxRoberts> $bytes = [System.Text.Encoding]::UTF8.GetBytes($email)
PS C:\Users\MaxRoberts> $hash = [System.Security.Cryptography.SHA256]::Create().ComputeHash($bytes)
PS C:\Users\MaxRoberts> [Convert]::ToBase64String($hash).Replace("+","-").Replace("/","_").TrimEnd("=")
GzCyh9SOxf0NP8bcfsV_BXmsY2Kohi8Zi-tTfxTFH3U
```

57. Google not only can take these steps as a large and sophisticated technology company, it can do so at scale and/or use other methods to identify a user's e-mail even if it is hashed. Suffice it to say, the FTC's warning is well-heeded that hashing is not an end-run around privacy.

58. Google also records "browser fingerprints" from users that are associated with user's communications. A browser-fingerprint is information collected about a computing device that can be used to identify the specific device, "such as your OS, browser version, screen resolution, language settings, time zone, installed extensions, and even your keyboard layout. On their own, these details might not seem revealing, but when combined, they create a fingerprint that's often unique to you."[16]

59. As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[17]

60. The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[18] In addition, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

61. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[19]

---

[16] Michael Pedley et al., *What is Browser Fingerprinting?  7 Ways to Stop It (2025 Guide)*, EXPRESSVPN (Aug. 13, 2025), https://www.expressvpn.com/blog/browser-fingerprints/.

[17] Justin Schuh, *Building a more Private Web*, GOOGLE (Aug. 22, 2019), https://www.blog.google/products/chrome/building-a-more-private-web/.

[18] Chris Hauk, *What is Browser Fingerprinting? How it Works and How to Stop it*, PIXELPRIVACY (Apr. 11, 2024), https://pixelprivacy.com/resources/browser-fingerprinting/.

[19] Yinzhi Cao, Song Li & Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features* (Feb. 27, 2017), https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/.

62.     Defendant and Google, at a minimum, use the "em" identifier, "ga_uid" identifier, and browser fingerprints associated with users' communications to link Plaintiff and Class Members to Google profiles, thus de-anonymizing and identifying users.

**III.     DEFENDANT USES AND EMPLOYS THE THIRD PARTIES' PIXELS TO IDENTIFY USERS TO FACILITATE MARKETING AND ADVERTISING**

63.     To summarize the preceding allegations, Meta and Google's pixels—as installed, used, and employed by Defendant—collect in real time the contents of user's insurance-related communications with the Website.  The Third Parties also record and decode the "addressing information" (*e.g.*, the unique user identifiers like the c_user cookie and hashed e-mail) associated with those communications.

64.     The purpose of this data collection is to facilitate marketing and targeted advertising by Defendant, which is major driver of Defendant's revenue.  THE ZEBRA RAISES $150M SERIES D AT $1B+ VALUATION (Apr. 12, 2021) (noting that Defendant "increase[ed] consumer awareness through a national advertising campaign," which naturally results in more revenue when users use Defendant's service).[20]  Defendant thus uses or employs the Third Parties' pixels to identify users to facilitate marketing and advertising.

**A.     Defendant Uses Meta's Pixel To Identify Users And Drive Revenue Through Marketing And Advertising**

65.     To implement the Meta pixel, a website administrator like Defendant places the pixel's code on its website.  Once placed, this code will load "a library of functions," that are the "core mechanism of the FB Pixel."[21]

66.     Not only does Defendant install the Meta pixel, it specifically configures it. Defendant "define[s] … the behavior they wish to track and report to FB, by defining *events*, *i.e.*, actions, that a user takes on the website."[22]  When in use, the pixel "reports to [Facebook] information about [each] event and [the] user that caused it," for Meta's "use in ad-conversion and further user

---

[20] Available at https://www.thezebra.com/about/press-awards/the-zebra-raises-150m-series-d-at-1b-valuation/.

[21] Bekos et al., *supra*, at 2, https://arxiv.org/pdf/2208.00710.

[22] *Id.* (emphasis in original).

profiling and tracking."[23]

67. Meta also offers an "Advanced Matching" feature that Defendant employs, which "look[s] for recognizable form fields and other sources on your website that contain information such as first name, last name and email."[24] That information is recorded, "along with the event, or action, that took place."[25]

> You can use Advanced Matching to help:
>
> - Increase the number of attributed conversions. We can match more of the conversions that happen on your website to people on Meta. This helps you understand the impact of your ads on website conversions.
>
> - Increase your Custom Audience size. We're able to better match your website visitors to people on Meta and increase the size of your Custom Audience.
>
> - Decrease the cost per conversion. Conversion-optimized campaigns become more efficient because we can better identify and deliver ads to the types of people likely to take the actions you care about.

68. Regardless of this feature though, the disclosure of the user's c_user cookie and other identifiers to Meta enables Meta to match users up to Facebook profiles.

69. Meta collects and records information on Defendant's Website to facilitate marketing and advertising, which Defendant benefits from.

70. Meta operates what is known in the ad-tech space as a "walled garden." "A walled garden is a closed platform where the publisher or technology provider controls access to hardware, applications, content, and user data. In this environment, all advertising activities—from ad buying and serving to measurement and reporting—take place exclusively within the platform's ecosystem."[26]

---

[23] *Id.*

[24] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

[25] *Id.*

[26] WHAT IS A WALLED GARDEN?, Adjust, https://www.adjust.com/glossary/walled-garden/

71.    "Walled gardens emerged as a strategy by major tech companies such as Google, Meta, and Amazon to monetize their vast amounts of first-party data by charging advertisers for access.  The combined ad revenue of these three companies exceeds the total ad revenue generated by all other ad tech firms."[27]

72.    To put this another way, on a typical website, the website controls which advertisements are shown to which users and contracts with various third parties to access the website's data.  By contrast, publishers who choose to advertise on Meta do not control "who sees the ads and how the data is used"—Meta does.[28]  And while a company "can create a targeted ad campaign on Facebook, it cannot export user data for use on other platforms."[29]

73.    The advantage of advertising on a Meta platform is that Facebook and Instagram users provide significant personal information to Meta—their names, their contact information, their interests, etc.  This "provid[es] advertisers with detailed insights into user behavior, preferences, and demographics" and "enables highly precise targeting, allowing for personalized and relevant ad campaigns that resonate with the target audience,"[30] more so than an advertiser might be able to accomplish on its own website.

74.    As a result of this structure and efficiency, in 2024, Meta generated $164.5 billion in revenue.[31]  Approximately $160.6 billion of that was earned through advertising.[32]

75.    This structure enables Defendant to, for instance, advertise to users on Meta's platform with an interest in securing insurance.  Meta is able to determine who to advertise to by (i) identifying users through identifiers such as the c_user cookie, (ii) connecting those users to Facebook profiles that may include information that contributes to targeting, and (iii) connecting events from Defendant's Website and others to that profile, thus better informing advertising efforts

---

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Meta Reports Fourt Quarter and Full Year 2024 Results*, META (Jan. 29, 2025), https://investor.atmeta.com/investor-news/press-release-details/2025/Meta-Reports-Fourth-Quarter-and-Full-Year-2024-Results/default.aspx.

[32] *Id.*

(*i.e.*, making it clearer that the user is interested in insurance because the user visited insurance-related websites).

76.    Meta sells advertising space by highlighting its ability to target users.[33]  Meta can target users so effectively because it surveils user activity both on and off its site.[34]  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[35]

77.    Meta provides its users for sale to advertisers like Defendant in a number of ways. For instance, Meta compiles user information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[36]

78.    Advertisers like Defendant can also build "Custom Audiences" based on the information Meta has collected about users.[37]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[38]

79.    With Custom Audiences, advertisers can target existing customers directly, and can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[39]

80.    Unlike Core Audiences, advertisers like Defendant can build Custom Audiences and Lookalike Audiences only if they first supply Meta with the underlying data.  They can do so through

---

[33]  *Why Advertise On Facebook, Instagram and Other Meta Technologies*, META, https://www.facebook.com/business/help/205029060038706 (last accessed Feb. 4, 2025).

[34]  *About Meta Pixel*, META, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last accessed Feb. 4, 2025).

[35]  *Audience Ad Targeting*, META, https://www.facebook.com/business/ads/ad-targeting (last accessed Feb. 4, 2025).

[36] META, https://www.facebook.com/business/news/Core-Audiences (last accessed Feb. 18, 2025).

[37] META, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227.

[38] META, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[39] META, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531.

two mechanisms: by manually uploading contact information for customers, or by utilizing Meta's "Business Tools,"[40] including Meta's pixel.

81. After collecting and intercepting information from users, Meta processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

82. Meta's own documentation makes clear just how much tracking of private information its pixel does. Meta states that its pixel "[m]ake[s] sure your ads are shown to the right people. *Find ... people who have visited a specific page or taken a desired action on your website*."[41]

83. Meta instructs business customers like Defendant that:

> Once you've set up the … Pixel, *the pixel will log when someone takes an action on your website*. Examples of actions include adding an item to their shopping cart or making a purchase. *The Pixel receives these actions, or events*, which you can view on your … Pixel page in Events Manager. From there, you'll be able to see the actions that your customers take. *You'll also have options to reach those customers again through future Meta ads*.[42]

84. In other words, not only does Meta collect an enormous amount of information, Defendant configures which events Meta collects and has full visibility into that.

85. Meta not only helps Defendant with advertising to its own users outside the Website, but also to include individual users among groups targeted by *other* Facebook advertisers relating to the conditions about which users communicated on Defendant's Website. Meta' Business Help Center explains: Meta *uses marketing data to show ads to people who are likely to be interested in them*. One type of marketing data is website events, which are *actions that people take on your website*.[43]

---

[40] META, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568; META, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341.

[41] *About Meta Pixel*, META, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (emphasis added).

[42] *Id.* (emphasis added).

[43] *About Standard And Custom Website Events*, META, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (emphasis added).

86. Meta confirms, in its "Meta Business Tools Terms,"[44] that it has the capability to use information it collects for purposes other than recording it and conveying it to websites. For instance, Meta can use the information it collects "to promote safety and security on and off the Meta Products, for research and development purposes and to maintain the integrity of and to provide and improve the Meta Products." In other words, Meta can use the wiretapped information for its own "research and development," and well as to "protect" its own products and services.

87. Meta can also connect all information it collects to analyze and generate reports regarding advertising campaigns, create custom audience sets that can be shared with other advertisers, and "use your Event Data for ads delivery only after aggregating such Event Data with other data collected from other advertisers or otherwise collected on Meta Products."[45]

88. Defendant can see what actions "[its] customers take"[46] to "segment [its] website visitors into groups based on the actions they have taken on [its] website."[47] In addition, with the Pixel, Defendant can "[a]dd events on the pages that matter to [their] business to help [] understand [] customers' journey[s]. If [one were to] set up events along their path (for example, from product page views to a purchase) it may help [] measure and optimize [] ads for the conversions that mean the most to [one's] business."[48]

89. Further, Meta can use the event data to help websites "reach people with transactional and other commercial messages on [Facebook] Messenger and other Meta Products."[49]

90. Finally, Meta can use the information it collects "to personalize the features and content (including ads and recommendations) that we show people on and off our Meta Products."[50]

---

[44] META, META BUSINESS TOOLS TERMS, https://m.facebook.com/legal/businesstech.

[45] Id.

[46] About Meta Pixel, META, https://www.facebook.com/business/help/742478679120153 (last accessed Feb. 4, 2025).

[47] Custom Audiences, META, https://developers.facebook.com/docs/meta-pixel/implementation/custom-audiences (last accessed Feb. 4, 2025).

[48] About Standard And Custom Website Events, Meta, https://www.facebook.com/business/help/964258670337005 (last accessed Feb. 4, 2025).

[49] META, META BUSINESS TOOLS TERMS, https://facebook.com/legal/businesstech.

[50] Id.

91.     Thus, Meta has the capability to use the information it wiretaps for purposes other than simply providing it to websites, including but not limited to its own contact information matching; measurement and analytics services; ad targeting; commercial and transactional messages; ad delivery improvement; feature and content personalization; product improvement, provision, and securement; and maintaining its own internal ecosystem of data for advertisers.

**B.     Defendant Uses Google's Pixel To Identify Users And Drive Revenue Through Marketing And Advertising**

92.     Google offers a range of advertising software that have the capability to track Website users, one of which is called Google Analytics.

93.     "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights" for businesses.[51]  This is made possible by a piece of code installed on a website that collects information on how website and app users interact with a business' website, including "how many users bought an item … by tracking whether they made it to the purchase-confirmation page."[52]  Google advertises that this service can "[m]onitor activity on your site as it happens" (*i.e.*, in real time).[53]

94.     Pivotal to the functioning of Google's services, Google's business model involves entering voluntary partnerships with various companies and surveilling communications on their partners' websites with Google Analytics.

95.     Thus, through websites that employ Google's services, Google directly receives the electronic communications of website visitors entered the website.

96.     That information is then analyzed by Google before it is provided to any entity that was a party to the conversation (like Defendant).  In order to conduct this analysis, Google views the information in real time when the data is processed in its servers.

97.     Google also facilitates advertising on other websites and platforms that website operators like Defendant can place bids to run in.  In other words, Defendant can work with Google

---

[51] *Analytics Help: How Google Analytics Works*, GOOGLE, https://support.google.com/analytics/answer/12159447?hl=en&ref_topic=14089939&sjid=2827624563183915220-NC.

[52] *Id.*

[53] *The Finer Points*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/.

and other ad-tech providers to advertise its business on other websites, something facilitated by the information about its users that Defendant enables Google to collect.

98.     Some of the reasons that Google is so effective for advertising are that Google has "advanced targeting capabilities allow you to harness intent by reaching out to prospects based on their specific interests, boosting chances of a higher conversion rate," targeting "based on keywords, audience demographics, device, time of the day, etc.," and an "extensive audience" due to its dominance as a search engine, which provides businesses like Defendant with "massive exposure" for their offerings.[54]

94.     Principally, Google works within the real-time bidding ecosystem.  "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[55]

99.     Google's role within RTB is multi-fold.  For example, Google itself may run the auction to determine "which ads should show" when "someone searches on Google or visits a site that shows ads."[56]  To do this, Google works with a number of players in the ad-tech space, but also works with website operators like Defendant.

100.    For instance, let's say a user were searching for insurance quotes on Google itself.  A user might see "sponsored results" that are the result of a real-time auction.  Defendant, in this instance, would be paying to show such users an advertisement for its business, and Google would be able to more effectively target a user based on the information Defendant enables Google to collect from its Website (*e.g.*, information about the user's identity, the user's interactions with the Website).

101.    The same process would occur if, say, the user visited any other website where there was advertising space.  Based on its collection of the aforementioned identifiers, Google could

---

[54] SPARKLIGHT ADVERTISING, WHY GOOGLE ADS ARE EFFECTIVE AND BEST PRACTICES (Mar. 12, 2024), https://sparklightadvertising.com/why-google-ads-are-effective/.

[55] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

[56] HOW THE GOOGLE ADS AUCTION WORKS, https://support.google.com/google-ads/answer/6366577?hl=en.

determine that the user who visited Defendant's Website is the same person as the one on this other website, and therefore give Defendant an incentive to target this user (versus the user being anonymous and no more or less interested in Defendant's services than anyone else).

102. Once Google intercepts or records information from the Website, Google has the capability to use such information for its own purposes. "Google uses the information shared by sites and apps to deliver [] services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on [] partners' sites and apps."[57]

103. Google's range of software services is based on Google's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on their web habits. This involves collecting visitor information from thousands of websites and then analyzing that information to /group web users so they can be targeted for products or services based on their interests.

104. In sum, Google has the capability to use the Website communications to: (i) improve its own products and services; (ii) develop new Google for Business and Google Analytics products and services; and (iii) analyze website visitors' communications to assist with data analytics and targeted advertising.

IV.    EXPERIENCE OF PLAINTIFF PENNING

105. Plaintiff Penning first used The Zebra Service on the Website to search for, obtain, and compare price quotes from multiple insurance providers in January 2025.

106. Plaintiff Penning has an active Facebook account, which he has maintained for approximately ten years. Plaintiff Penning routinely logged onto his Facebook account on the same web browser he used to access Defendant's Website. When creating his Facebook account, Plaintiff Penning provided Facebook with his PII, including his name, email address, date of birth, residency, and gender.

107. Plaintiff Penning has an active Google account, which he has maintained for approximately twelve years. During that time, Plaintiff Penning routinely logged onto his Google

---

[57] *Privacy and Terms*, GOOGLE, https://policies.google.com/technologies/partner-sites.

account on the same web browser he used to access Defendant's Website. When creating his Google account, Plaintiff Penning provided Google with his PII, including his name and date of birth. Google also collected information related to his browser and device every time he logged into his Google account, including his IP address and other information related to his device.

108. Plaintiff Penning used the Website to search for, obtain, and compare price quotes from multiple insurance providers for car insurance in January 2025. In doing so, Plaintiff either wrote in, or chose the appropriate answer for a long list of personal questions, including but not limited to: (1) current insurance status; (2) whether he rents or owns his home; (3) make, model, and year of car he needed insurance for; (4) name; (5) birthday; (6) email address; (7) gender; (8) marital status; (9) credit score; (10) highest level of education; (11) employment status; and (12) phone number. Each of these constitute communications between Plaintiff Penning, on the one hand, and Defendant on the other hand.

109. When Plaintiff Penning communicated with the Website, as described above, the Third Parties—as employed by Defendant—collected the contents of Plaintiff Penning's communications, including but not limited to the type of insurance (car insurance) and what actions (comparing quotes) Plaintiff Penning was requesting.

110. Moreover, when Plaintiff Penning communicated with the Website, the Third Parties' pixels were installed by Defendant on Plaintiff Penning's browser. Defendant and the Third Parties used their respective pixels to record and decode the addressing information associated with Plaintiff Penning's communications, including but not limited to Plaintiff Penning's Facebook user ID (*i.e.*, the c_user cookie value), Google user ID, hash of his G-Mail, and browser fingerprint.

111. Defendant and the Third Parties used this information to (i) connect Plaintiff Penning to profiles maintained by the Third Parties, (ii) building on those profiles via the information collected about Plaintiff Penning on the Website, and (iii) serve Plaintiff Penning with advertisements related to his communications with the Website.

112. At all relevant times, Plaintiff Penning never consented to, agreed to, or otherwise permitted Defendant to cause or enable the Third Parties to collect, record, or decode his personally identifiable information or insurance information on the Website. Defendant provided neither actual

nor constructive notice of its privacy-defying practices, such as through a conspicuous hyperlink or clickwrap agreement.

113. Likewise, Defendant never gave Plaintiff Penning the opportunity to prevent the disclosure of his personally identifiable information or insurance information on the Website.

114. Finally, Defendant never received a court order permitting it to facilitate this collection and disclosure.

115. Thus, Plaintiff Penning has had his privacy invaded by Defendant's action, and Defendant has likewise been unjustly enriched through the Third Parties' surreptitious and unconsented-to collection of Plaintiff Penning's data, which facilitated Defendant's advertising efforts and subsequent revenue.

## CLASS ALLEGATIONS

116. **Class Definition:** Pursuant to Fed. R. Civ. P. Rule 23(a) and 23(b)(3), Plaintiff seeks to represent a class defined as all persons in the United States who, during the class period, had their personally identifiable information or protected information collected by Meta, Google, or other third-party entities on the Website (the "Nationwide Class").

117. Plaintiff also brings this action on behalf of a subclass defined as all persons in the state of California who, during the class period, had their personally identifiable information collected by Meta, Google, or other third-party entities on the Website (the "California Subclass") (collectively with the Nationwide Class, the "Classes").

118. Plaintiff reserves the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

119. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

120. Excluded from the Classes are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any

judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

121. **Numerosity/Ascertainability.**    Members of the Classes (hereinafter, "Class Members") are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff at this time.  However, it is estimated that there are hundreds of thousands of individuals in the Classes based on the scope of Defendant's business.  The identity of such membership is readily ascertainable from Defendant's records and non-party records, such as those of Meta and Google.

122. **Common Questions of Law and Fact Predominate/Well Defined Community of Interest.** Questions of law and fact common to Class Members predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Classes.  Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include:

(i) Whether Defendant aided, agreed with, employed, or procured the Third Parties;

(ii) Whether Defendant installed and used the Third Parties' pixels;

(iii) Whether the information intercepted and recorded by the Third Parties constitutes the "contents" of Plaintiff's and Class Members' communications with the Website;

(iv) Whether the identifiers recorded by the Third Parties are "routing, addressing, or signaling" information; and

(v) Whether Plaintiff and members of the Class are entitled to actual and/or statutory damages for Defendant's violations of the ECPA and the CIPA.

123. **Typicality.** Plaintiff's claims are typical of the claims of the Classes because Plaintiff used the Website and, as a result of Defendant's unlawful conduct, had his information intercepted and recorded by Meta and Google without his express written authorization or knowledge.  Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

124. **Adequacy.** Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members.  Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Classes.  Plaintiff is represented by attorneys with

experience in the prosecution of class action litigation generally and in data privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Classes.

125. **Superiority**. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

**CAUSES OF ACTION**

**COUNT I**
**Violation of the Electronic Communications Privacy Act**
**18 U.S.C. §§ 2510, *et seq.***

126. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

127. Plaintiff brings this claim on behalf of himself and members of the Nationwide Class.

128. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

129. The ECPA protects both sending and the receipt of communications.

130. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

131. Plaintiff's and Class Members' interactions with the Website—such as filling out the forms to request insurance quotes—qualify as "communications." 18 U.S.C. § 2510(12).

132. The detailed URLs collected by the Third Parties—which enabled the Third Parties to determine the types of insurance Plaintiff and Class Members were seeking, various actions on

the Website, and potentially more detailed information such as the home type—are the "contents" of Plaintiff's and Class Members' communications.  18 U.S.C. § 2510(8).

133.   The Third Parties' tracking pixels are "devices" or "apparat[i]" that intercepted (acquired) the contents of Plaintiff's and Class Members' electronic communications with the Website contemporaneously with said communications.  18 U.S.C. §§ 2510(4)-(5).

134.   By utilizing, embedding, and profiting from the tracking technology provided by Meta and Google on its Website, Defendant intentionally procured the Third Parties to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

135.   The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.  Here, as alleged above, "[t]he association of Plaintiff's [and Class Members'] data with preexisting user profiles is a further use of Plaintiff's [and Class Members'] data that satisfies [the crime-tort] exception," because it "violate[s] state law." *Brown v. Google, LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021); *Marden v.LMND Medical Group, Inc.*, 2024 WL 4448684, at *2 (N.D. Cal. July 3, 2024); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024).

136.   More specifically, Defendant violated a provision of the Gramm-Leach-Bliley Act, 16 C.F.R. § 313.  This provision imposes a criminal penalty for knowingly disclosing "nonpublic personal information" to a third party.  GLBA defines nonpublic personal information as:

> Any information that is not publicly available and that: a consumer provides a financial institution to obtain a financial product or service from the institution; results from a transaction between the consumer and the institution involving a financial product or service; or a financial institution otherwise obtains about a consumer in connection with providing a financial product or service.

16 C.F.R. § 313.

137.   Plaintiff's and Class Members' information that Defendant procured to Meta and Google to intercept qualifies as nonpublic personal information (including information related to their housing status and insurance coverage), and Defendant violated Plaintiff's and Class Members' expectations of privacy.  Such conduct constitutes tortious and/or criminal conduct through a

violation of 16 C.F.R. § 313. Defendant specifically used the tracking technology provided by Meta and Google to track and utilize Plaintiff's and Class Members' PII for financial gain.

138. Defendant was not acting under the color of law to intercept Plaintiff's and Class members' wire or electronic communications.

139. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy. Plaintiff and Class members had a reasonable expectation that Defendant would not intercept their communications and sell their data to dozens of parties without their knowledge or consent.

140. As a result of every violation thereof, on behalf of himself and the Nationwide Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of the ECPA. 18 U.S.C. § 2520.

## COUNT II
### Violation Of The California Invasion Of Privacy Act
### Cal. Pen.Code § 631

141. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

142. Plaintiff brings this claim individually and on behalf of the California Subclass against Defendant.

143. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

144. Further, "[t]hough written in terms of wiretapping, [the second clause of] Section 631(a) applies to Internet communications." *Javier*, 2022 WL 1744107, at *1. To avoid liability under CIPA § 631(a), a defendant must show it had the consent of *all* parties to a communication, and that such consent was procured *prior to* the interception occurring. *See id.*, at *2.

145. The Third Parties' pixels are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue.

146. The Third Parties are is a "separate legal entit[ies] that offer[] [a] 'software-as-a-service' and not merely [] passive device[s]." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties have the capability to use the wiretapped information for a purpose other than simply recording the communications and providing the communications to Defendant. Accordingly, Meta and Google are third parties to any communication between Plaintiff and California Subclass Members, on the one hand, and the Website, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

147. At all relevant times, the Third Parties willfully and without the consent of all parties to the communication, and in an unauthorized manner, read, attempted to read, and learned the contents the electronic communications of Plaintiff and California Subclass Members, on the one hand, and Defendant's Website, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

148. At all relevant times, the Third Parties used those intercepted communications, including but not limited to building comprehensive user profiles that are offered for disclosure or sale to prospective advertisers.

149.    At all relevant times, Defendant aided, agreed with, or otherwise enabled the wiretapping of the Third Parties by placing the Third Parties' code on its Website, causing the Third Parties' pixels to be installed on Plaintiff's and California Subclass Members' browsers, configuring the information that Defendant wanted the Third Parties to intercept, and profiting from those disclosures by enabling Defendant to target Plaintiff, California Subclass Members, and other related used with advertising.

150.    Plaintiff and California Subclass Members did not provide their prior consent to the Third Parties intentional interception, reading, learning, recording, collection, and usage of Plaintiff's and California Subclass Members' electronic communications.  Nor did Plaintiff and California Subclass Members provide their prior consent to Defendant's enablement of the same.

151.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and California Subclass Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## COUNT III
### Violation Of The California Invasion Of Privacy Act,
### Cal. Pen. Code § 632

152.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

153.    Plaintiff brings this Count individually and on behalf of the members of the California Subclass against Defendant.

154.    CIPA § 632(a) prohibits an entity from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

155.    The Third Parties' tracking technologies are "electronic amplifying or recording device[s]." *Id.*

156.    At all relevant times, the communications between Plaintiff and California Subclass Members on the one hand, and Defendant's Website on the other, were confidential.   The

communications were "confidential" because, as alleged above, the communications concerned insurance-related or financial information that is protected by federal and California law.

157.    At all relevant times, Defendant intentionally used the Third Parties' tracking technology to record Plaintiff's and California Subclass Members' confidential communications with the Website.

158.    When communicating with Website, Plaintiff and California Subclass Members had an objectively reasonable expectation of privacy, based on the California Insurance Information and Privacy Act, the Graham-Leach Bliley Act, and the California Financial Information Privacy Act. Thus, Plaintiff and California Subclass Members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and that other, third-party entities like Meta and Google would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

159.    Defendant is a "financial institution" under 15 U.S.C. § 6809(3) because it is a business providing insurance quotes, or otherwise facilitating the purchase of insurance.[58]

160.    Plaintiff and California Subclass Members are "consumers" under 15 U.S.C. § 6809(9) because they secured financial products or services (insurance quotes) from Defendant (a financial institution) for their personal or household use.

161.    Plaintiff and California Subclass Members had their "nonpublic personal information" recorded by Defendant using the Third Parties' pixels because the information here was (i) provided by Plaintiff and California Subclass Members to Defendant; and (ii) the information identified Plaintiff and California Subclass Members because it was linked to their Facebook or Google profiles.  15 U.S.C. § 6809(A)(i).

162.    Plaintiff and California Subclass Members did not provide their prior consent to the aforementioned recording of their confidential communications.

[58] GLBA / HIPAA Privacy Comparison Chart, https://tinyurl.com/msdjvj4r.

163. Pursuant to Cal. Penal Code § 637.2, Plaintiff and California Subclass Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

**COUNT IV**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Pen. Code § 638.51**

164. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

165. Plaintiff brings this claim individually and on behalf of the proposed California Subclass against Defendant.

166. CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

167. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

168. A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

169. In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

170. For example, if a user sends an email, a "pen register" might record the email address it was sent from, the email address the email was sent to, and the subject line—because this is the user's *outgoing* information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from, the email address it was sent to, and the subject line—because this is *incoming* information that is being sent to that same user.

171.    Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line.  As technology has advanced, however, courts have expanded the application of these surveillance devices.

172.    This, combined with the California Supreme Court's mandate to read provisions of the CIPA broadly to protect privacy rights, has led this Court and others to apply CIPA § 638.50 to internet tracking technologies similar if not identical to the Defendant's technologies at issue here. *See*, *e.g.*, *Gabrielli v. Haleon US Inc.*, 2025 WL 2494368, at *11-12 (N.D. Cal. Aug. 29, 2025) (Orrick, J.) (finding internet tracking technology constituted a "pen register"); *In re Meta Pixel Tax Filing Cases*, 793 F. Supp. 3d 1147, 1152 (N.D. Cal. 2025) (finding Meta pixel at issue here was a "pen register"); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (finding trackers were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Riganian v. Liveramp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1093-94 (N.D. Cal. 2025) (same); *Garon v. Keleops USA, Inc.*, 2025 WL 2522374, at *4-5 (N.D. Cal. Sept. 2, 2025) (same); *Deivaprakash v. Condé Nast Digital*, --- F. Supp. 3d ---, 2025 WL 2541952, at *2-4 (N.D. Cal. Sept. 4, 2025) (same); *Lesh v. Cable News Network, Inc.*, 767 F. Supp. 3d 33, 40-41 (S.D.N.Y. 2025) (same); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software provided by data broker was a "pen register").

173.    The Third Parties' pixels are "pen registers" because they are "device[s] or process[es]" that "capture" the "routing, addressing, or signaling information"—including but not limited to Plaintiff's and California Subclass Members' Facebook ID, Google ID, hashed e-mail, and browser fingerprints—from the electronic communications transmitted by Plaintiff's and California

Subclass Members' computers to the Website. Cal. Penal Code § 638.50(b); *see also Shah*, 754 F. Supp. 3d at 929; *Mirmalek*, 2024 WL 4102709, at \*3.

174. At all relevant times, Defendant installed the Third Parties' pixels —which are pen registers—on Plaintiff's and California Subclass Members' browsers, which enabled the Third Parties to record and decode the aforementioned addressing information associated with Plaintiff's and California Subclass Members' Website communications. Defendant and the Third Parties used the Third Parties' pixels to identify Plaintiff and California Subclass Members by matching them to profiles held by the Third Parties, and to facilitate targeting advertising on Meta's website and on websites employing Google's ad-serving technology.

175. Although the Third Parties' pixels may have also recorded the content of communications, this is not a bar to the pixels being "pen registers." *Haleon*, 2025 WL 2494368, at \*12; *see also In re Meta Pixel Tax Filing Cases*, 793 F. Supp. 3d at 1153-54. This is also the case because the pixels have "an array of capabilities" that have independent functions that record addressing information and contents. *In re Meta Pixel Tax Filing Cases*, 793 F. Supp. 3d at 1155.

176. Plaintiffs and California Subclass Members did not provide their prior consent to Defendant's installation or use of the Third Parties' pixels or any other tracking technology at issue.

177. Defendant did not obtain a court order to install or use the Third Parties' pixels or other tracking technology at issue.

178. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and California Subclass Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all Class Members, seeks judgment against Defendant, as follows:

    (i)     For an order certifying the Classes pursuant to Fed. R. Civ. P. 23, naming Plaintiff as the representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes.

    (ii)     For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(iii)    For compensatory, punitive, and statutory damages in amounts to be determined by the Court and/or jury;

(iv)    For pre- and post-judgment interest on all amounts awarded; and

(v)    For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all claims so triable.

Dated: December 19, 2025                    Respectfully submitted,

                                            **BURSOR & FISHER, P.A**.

                                            By: */s/ Max S. Roberts*
                                                    Max S. Roberts

                                            Max S. Roberts (State Bar No. 363482)
                                            1330 Avenue of the Americas, 32nd Floor
                                            New York, NY 10019
                                            Telephone: (646) 837-7150
                                            Facsimile:  (212) 989-9163
                                            E-mail: mroberts@bursor.com

                                            **BURSOR & FISHER, P.A.**
                                            Philip L. Fraietta (State Bar No. 354768)
                                            50 Main Street, Suite 475
                                            White Plains, NY 10606
                                            Telephone: (914) 874-0710
                                            Facsimile:  (914) 206-3656
                                            E-mail: pfraietta@bursor.com

                                            *Attorneys for Plaintiff*